# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DEBRA KAYE SCHUMACHER, )
)
          Plaintiff, )
)   Judge Joan B. Gottschall
          v. )
)   Case No. 10 C 3406
MICHAEL J. ASTRUE )
Commissioner of Social Security, )
)
          Defendant. )

## MEMORANDUM OPINION & ORDER

Debra Kaye (sometimes spelled "Kay") Schumacher seeks judicial review of a decision by the Commissioner of Social Security ("Commissioner") in which the Commissioner denied Schumacher relief on her claim for disability insurance benefits ("DIB").[1] Schumacher completed her application for these benefits on November 5, 2007, claiming that she had been disabled since November 8, 2006 due to the after-effects of stroke and seizures. Her claim was denied on February 25, 2008, based on a finding that she was capable of light, unskilled work. Schumacher requested reconsideration, which was denied. She then sought a hearing before an Administrative Law Judge ("ALJ"). The ALJ held a hearing and issued an unfavorable decision on June 12, 2009. Schumacher appealed, but the Appeals Council denied her request for review. Schumacher has now filed a complaint in this court and moved for summary judgment. For the reasons below, the motion is denied.

---

[1]     As the Commissioner noted in response, the record contains an application for supplemental security income. The Commissioner states that Schumacher's counsel confirmed that she was only seeking DIB. Schumacher has not addressed this issue in her briefing, and so the court presumes this is correct.

# I. BACKGROUND

At the time of the hearing, Schumacher was forty-five years old. She had completed high school and taken a few college courses, but she does not have a college degree. Her past employment included work as a traffic controller for a paper company. In that position, she checked inventory and ensured that the delivery trucks were properly loaded with items for various stores. This was her last substantial gainful activity ("SGA") prior to her alleged disability onset date of November 8, 2006. Schumacher claims to suffer from the after-effects of stroke and seizures. She had a stroke on April 4, 2005, followed by two seizures, the first on November 8, 2006, followed by one in December of that year. The court was not provided with medical records relating to the stroke or to an earlier gastric bypass surgery.

## A.   Medical History

Schumacher was hospitalized in November 2006. Dr. R. Warren Schubert, the attending physician, noted that she was admitted for new onset seizure, and had a history of cerebrovascular accident (the stroke) and a gastrointestinal bleed. She was loaded with anti-seizure medication, and remained stable throughout the hospitalization. (R. 221.) While hospitalized, she had a consultation with both neurology and hematology. Dr. Arvind Kumar saw Schumacher for her thrombocytopenia, and noted her history of anemia. (R. 222.) At the time, Schumacher denied any headaches, numbness, tingling, or weakness in the extremities. (*Id.*) Dr. Surendra Gulati, her consulting physician, noted that she had had a stroke on April 2005, but she had no history of seizures prior to the present incident. (R. 227.) He found that Schumacher had "[n]o definite weakness of arms and legs." (R. 228.) He stated that although Schumacher seemed to have a post

infarct seizure disorder, he had been informed by Schumacher's husband that she was drinking ten ounces of vodka each day. (R. 225.) This meant that the seizure could have been an alcohol withdrawal seizure, although Dr. Gulati could not be certain. (*Id.*) Schumacher had electroencephalograms ("EEG") taken, and they were found to be "mildly abnormal" but without any spike or spike wave discharge. (R. 229, 231.) Various doctors ran imaging tests, but other than the evidence of her previous infarction, nothing unusual was observed. (R. 233-36.) A number of the doctors who saw her specifically mentioned her alcoholic beverage intake. Schumacher was discharged in fair condition. (R. 221.) On February 24, 2007, Dr. Gulati administered another EEG. That EEG indicated that Schumacher's basic background activity was "fairly well organized," and as before, although there were some spots of excessive activity, no spikes were observed. (R. 219.)

Schumacher next visited the hospital in August 2007 after being found passed out by her young children. (R. 248.) She was intoxicated, and she admitted to being an alcoholic and to occasional binge drinking. (R. 248, 254.) The emergency department clinician, Dr. Matthew Nitsche, noted that Schumacher had no definite seizure activity at the time, and diagnosed her as having alcohol intoxication. (R. 249.) Schumacher denied having any suicidal thoughts.

In November 2007, Dr. Gulati evaluated Schumacher based on complaints of memory disturbance. (R. 262.) As before, he found that her EEG was abnormal, but there were no observed spike discharges.

In December 2007, Schumacher was admitted for alcohol intoxication and suicidal ideation. Dr. Schubert reported that Schumacher had a significant history of

3

alcohol binge drinking. (R. 274.) She was referred to Dr. Gawtham Gutta for an evaluation, and he concluded that she needed "immediate abstinence and withdrawal of alcohol." (R. 278.) He also stated that she had equal strength in her upper and lower extremities, and she denied any numbness or asymmetrical weakness. (R. 277.) As part of this hospital trip, Schumacher had a psychiatric evaluation with Dr. Cosme Lozano. She strongly denied any suicidal tendencies, and she appeared alert, oriented, and had coherent and sequential though processes. (R. 280.) Dr. Lozano agreed that she was not suicidal, and recommended that she be discharged.

Schumacher saw a psychologist, Dr. William Hilger, as part of her disability determination in January 2008. Dr. Hilger found her to be a fluent and cooperative patient. (R. 291.) He performed various mental capacity tests, and found that she had fair mental potential so long as she kept taking her medication. (R. 294.) He stated that if Schumacher continued taking her medication, she should be able to perform work-related activities that involved understanding and memory, sustained concentration, and adaptation. He did note, however, that she might have to perform simpler, more repetitive clerical-type tasks. (*Id.*)

On February 12, 2008, Dr. Joseph Mehr performed a psychiatric review and completed a mental RFC assessment. He found that Schumacher had moderate restrictions on activities of daily living and in maintaining social functioning, but only mild limitations in maintaining concentration, persistence, or pace. (R. 305.) He noted some moderate limitations on her ability to understand, remember, and carry out detailed instructions. (R. 309.) However, he concluded that as long as she did not return to heavy drinking, she would be able to complete a normal workday and week. (R. 311.)

Dr. Ernest Bone completed a physical RFC assessment on February 15, 2008. He placed some limitations on Schumacher's ability to lift or carry more than ten to twenty pounds, and stated that she should only occasionally climb ramps or stairs and never climb ladders, ropes, or scaffolds due to her history of seizures. (R. 314-15.) He found no manipulative limitations, meaning that Schumacher had no limitations in feeling, handling, fingering, or reaching. (R. 316.) Dr. Bone also stated that there were no "residual effects" from the stroke at the time. (R 320.)

In a letter dated March 21, 2008, Dr. Schubert sent a letter stating that he believed Schumacher was disabled due to her stroke, seizures, and depression. (R. 355.) He also mentioned the side effects of her medications, which could cause drowsiness and lethargy, as well as the potential that any stress could increase her risk of gastric bleeding. (*Id.*) Included with the letter is a stroke RFC questionnaire. Dr. Schubert noted that emotional factors contributed to the severity of Schumacher's symptoms, and that she frequently experienced symptoms severe enough to interfere with attention and concentration. (R. 357.) He stated that she would need to take a break every hour or two with her legs elevated. (R. 358.) In measuring her hand strength and finger manipulation, Dr. Schubert stated that she had significant limitations, and could only use her left hand to grasp, turn, or twist 6% of the time and to perform fine manipulations 34% of the time. (R. 359.) Dr. Schubert found Schumacher incapable of even "low stress" jobs." (R. 360.)

In March 2008, Schumacher reported another "possible" seizure that might have occurred six weeks earlier. (R. 628.) The treating doctor was uncertain as to whether the event was a seizure, and an examination was negative. (*Id.*)

Dr. Gregory Hawley saw Schumacher at various points in the spring of 2008 for evaluation and treatment of depression. (R. 329-35.) During the sessions, Schumacher reported significant improvement on the medication that she had been prescribed, and said that she had no cravings or "slips" with respect to alcohol. (R. 334.) She did report issues with a gambling craving. (R. 332.) Lauran Jansons, a Psy.D., was also seeing Schumacher at this time for counseling. (R. 345-53.) Schumacher reported difficulty with activities like balancing a check book and cooking, and said that she was depressed. (R. 352.) After she returned from a camping trip in July 2008, Schumacher reported that she drank alcohol on the trip. (R. 432.) In November 2008, Dr. Hawley noted that Schumacher's mood seemed "much improved," and that she reported feeling "more focused" and had more energy. (R. 454.)

On December 25, 2008, Schumacher was admitted to the hospital emergency room after being found unresponsive following a night of drinking alcohol. (R. 486.) Dr. John Scala requested a psychiatry consult. Dr. Ronald Wuest completed the consultation, and concluded that Schumacher was suffering from alcoholism and depression. (R. 483-84.) He further mentioned that while her suicide risk was low, he could not be clear as to whether the incident was a suicide attempt. (R. 484.) He mentioned cognitive problems, although he noted that Schumacher seemed to be of above-average intelligence, with intact short- and long-term and remote memory. (*Id.*)

Dr. Hawley had continued seeing Schumacher every few months, and in a March 2009 report, Dr. Hawley noted that Schumacher had gone to Florida for two weeks and she "had a great time." (R. 451.) Schumacher also reported that her prescriptions helped her mood, and that she was taking care of her four-year-old granddaughter. (R 451, 453,

6

456.) Dr. Hawley noted Schumacher's logical, coherent, sequential, and goal-directed thought processes.

Dr. Schubert completed another stroke RFC questionnaire in April 2009. He listed Schumacher's progress as "guarded," and again concluded that she was incapable of even low stress jobs. (R. 408-12.) He did note, however, that Schumacher did not have significant limitations in reaching, handling, or fingering. (R. 411.) Later that month, Schumacher had a follow up visit with regard to asthma exacerbation. (R. 415.)

**B.     Schumacher's Testimony**

At the evidentiary hearing before the ALJ, Schumacher testified that she was a high-school graduate who had completed a few courses in college. (R. 38.) She was forty-five at the time of the hearing. (R. 67.) She worked as a traffic controller in a paper warehouse from some time in 2003 until November 2006, which was her last employment. (R. 39-41.) At that job, her primary duties were filing, data entry, and scheduling delivery for trucks. (R. 67.) Schumacher was capable of taking care of her own personal hygiene on a day-to-day basis, and reported that she could sit for an hour or two or walk a few blocks at a time. (R. 41.) She testified that she was able to crouch and bend or push and pull, and that while she could lift a gallon of milk with her right hand, she would be unable to lift more than five pounds with her left. (R. 42, 44.) She also stated that her corrected vision, sense of smell, hearing, and breathing were "okay," and the ALJ noted that Schumacher's speech was clear and understandable. (R. 43.) Schumacher further testified that she was able to pick up small items from a table with either hand, and that she had no problems with her feet or ankles.

Schumacher reported that she had last consumed alcohol a few months prior, and she had "a lot" of alcohol on Christmas Eve. (R. 44.) Schumacher reported that she had never been charged with driving under the influence, and that she had never been disciplined at work due to her alcohol consumption. She was not a member of Alcoholics Anonymous, but she stated that she sought help from a doctor by obtaining Vivitrol injections and taking Campral each day; both medications are used to help the patient avoid further alcohol intake. (R. 45.) Schumacher testified that she had not had a problem with alcohol before she had seizures. (R. 55.)

Schumacher's counsel questioned her, and elicited testimony that Schumacher had difficulty with feeling in her left fingers. (R. 47.) Schumacher claimed to have difficulty moving the fingers on her left hand unless she thought about it, and said that this affected her ability to type. (R. 48.) Schumacher had testified that she could operate a vehicle without difficulty, but on further examination she added that she could only drive if she knew "exactly" where she was going. (R. 46, 49.) She described doing "stupid things all the time," and claimed that her short term memory was "terrible." (R. 51.) She would occasionally cook supper for her family, and could do laundry and dishes, but she mostly just slept during the day and did not care for her granddaughter, who lived with her. (R. 51-52, 58.) Schumacher mentioned that her husband and her four children (all of whom lived with her) assisted with household chores such as cooking and cleaning. (R. 58.) She took medicine for her asthma and had recently been admitted to the hospital for breathing issues. (R. 53.) She noted that she had seizures following a stroke, and felt that she never got back to her pre-seizure state. (R. 54.) Schumacher took medication for the seizures, and recounted an incident a few months prior where she

thought she might have had another seizure. (R. 55-56.) Schumacher then testified that she had anemia and received intravenous iron every two years. (R. 56.) Finally, she testified that the major reason she could not work was an inability to concentrate, memory problems, depression and fatigue. (R. 57.)

**C.     Medical Expert Testimony**

Dr. Carl Lee testified before the court as a specialist in internal medicine. He reviewed Schumacher's medical records for impairments, and noted that she had had no physical residual from her stroke in 2005 until she had a seizure in November 2006. Other than a second seizure in December 2006, Dr. Lee said that there was no other seizure activity except the potential seizure to which Schumacher had testified. (R. 60.) Dr. Lee testified that when Schumacher was discharged from the hospital in December 2008, her neurological examination was normal, and when she was hospitalized for asthma the month before the hearing, her physical examination had also been reported as normal. (R. 61.) Dr. Lee also recognized that Schumacher had had gastric bypass surgery, anemia, a peptic ulcer (which had healed), and gastric reflux. (R. 61.) Dr. Lee concluded, however, that none of the impairments met or equaled a listing. (R. 62.)

In his opinion, a person with these conditions who abstained from alcohol would be able to do sustained work activity for eight hours a day and forty hours a week. Dr. Lee largely agreed with the RFC provided by Dr. Bone, although he disagreed with the environmental hazards portion of the report. (R. 62.) However, Dr. Lee disagreed with the RFC provided by Schumacher's treating physician, because there was no documentation to support many of that physician's conclusions.

Upon examination by Schumacher's counsel, Dr. Lee testified that it was possible Schumacher was fatigued based on her medications, but that he had not seen any fatigue described in her progress notes. (R. 63-64.) Dr. Lee had not looked at all at Schumacher's mental impairment. (R. 65.)

On re-examination, the ALJ questioned Dr. Lee at greater length regarding whether the intake of alcohol related to an assessment of neurological disorders, including strokes. (R. 68-69.) Dr. Lee testified that alcohol consumption could be related to strokes, and could exacerbate or induce manifestations such as seizures. Dr. Lee also mentioned that he had not considered the fact that Schumacher was taking Zomisamide, a medication that could impair concentration, as part of his RFC. (R. 69.) He further testified that it would be very difficult to sustain work based on the side effects of that medication. (R. 69.)

**D.     Vocational Expert Testimony**

Lee Knutson was called as a vocational expert, and classified Schumacher's job as being closest to a dispatcher for delivery of trucks, which according to the Dictionary of Occupational Titles ("DOT") qualified as sedentary, skilled employment with a specific vocational preparation of 6. The ALJ then described a hypothetical person who was capable of occasionally lifting twenty pounds and frequently lifting ten pounds, standing and walking six hours of an eight-hour day, and sitting with normal breaks for six hours of an eight-hour day. (R. 68.) This person also had the unlimited ability to push and pull and to reach in all directions; could frequently balance, stoop, and kneel; could occasionally crouch and crawl or use ramps and stairs; and could never use ladders, ropes, or scaffolds. This person could perceive pressure in her left ring and little fingers,

10

and would have unlimited corrective vision and communication. Finally, this hypothetical person would need to avoid concentrated exposure to any fumes, odors, dust, or gasses, vibration, hazardous moving machinery, or concentrated exposure to unprotected heights. (*Id.*) Based on these limitations, Knutson testified that the person would be able to perform a sedentary job as a dispatcher.

After further testimony, the ALJ modified his hypothetical to include the use of Zomisamide, and asked whether someone actually experiencing the possible side effects of that medication could do competitive work without special accommodation. (R. 69.) Knutsen testified that this person would not be able to perform any job; all work would be precluded. (R. 70.) Knutsen also stated that a person who slept most of the day would not be able to maintain employment. (R. 71.)

The ALJ modified the hypothetical once again, asking Knutsen to assume that based on medication the person was taking and the side effects the person might reasonably experience, the person was "off task" ten percent of the time for the entire work week. Knutsen testified that one only needed to be "on task" eighty-five to ninety percent of the time. (R. 71.) Knutsen further stated that a person having impaired judgment would not be able to perform a skilled job such as dispatch; such a person would be limited to unskilled work where she did not need to make decisions. (R. 72.) In his view, there were a large number of light, unskilled positions available, although some of these positions, such as assembly, would not be available if the person's fine finger dexterity or gross dexterity was affected. (R. 73.)

### E.     ALJ Decision

After the hearing, Administrative Law Judge Joseph Donovan, Sr. issued a twelve-page ruling in which he determined that Schumacher did not qualify as "disabled" within 20 C.F.R. 404.1520(a). In making this determination, the ALJ progressed through the five-step process set forth in 20 C.F.R. § 404.1520(a)(4) as follows.

First, the ALJ evaluated whether Schumacher had engaged in any substantial gainful activity ("SGA"). The ALJ found that Schumacher had not engaged in any disqualifying SGA as of her alleged disability onset date. Second, the ALJ concluded that Schumacher suffered from severe impairments, including her status post-gastric bypass surgery, her status post-cerebrovascular accident, her status post seizures, her status post-bleeding ulcer (which had healed), asthma, anemia, depression, and her history of alcohol abuse. The ALJ also noted that Schumacher had gastro-esophageal reflux disease, but that was controlled by medication and was not severe. Third, the ALJ evaluated Schumacher's impairments and found that they were not so severe as to meet or equal a listed impairment. The ALJ stated that this was in accord with opinions from the state agency medical consultants, the testimony of the medical expert, and counsel's concession.

The ALJ then evaluated Schumacher's RFC, and concluded that she was capable of performing "light" work as defined in 20 C.F.R. § 404.1567(b). He also limited her to "unskilled" work. The ALJ recognized that Schumacher had a loss of sensation in the little and ring fingers of her left hand, but found no functional limitation. While he agreed that Schumacher would suffer some of the alleged symptoms of memory loss, he did not find her to be credible concerning the intensity, persistence, and limiting effects

of those symptoms. (R. 23.) In particular, he agreed with the medical expert that there was nothing in the medical records to support her claims of fatigue. (R. 24.) He did not credit Dr. Schubert's stroke RFC questionnaire, because the doctor's progress notes contradicted the doctor's conclusion that Schumacher could not perform any work. The ALJ also found relevant the fact that Schumacher's daily activities were not consistent with Dr. Schubert's RFC: she could do laundry, cook, go to the grocery store, and had also taken some vacation trips. (R. 25.) The ALJ agreed that Schumacher's decisionmaking ability was impaired, and so the ALJ limited her to unskilled work that would not require much decisionmaking. (R. 27.)

In step four, the ALJ evaluated whether Schumacher would be able to perform her past work in light of her RFC. As her past work was classified as "skilled," the ALJ concluded that she could not perform that job. In the final step, the ALJ concluded that even with Schumacher's restriction to light, unskilled work, and even taking into consideration her additional limitations, there were a significant number of jobs available in the economy. As a result, the ALJ found Schumacher not to be disabled.

## II. DISCUSSION

### A. Standard of Review

"Where, as here, the Appeals Council denies a claimant's request for review, the ALJ's ruling becomes the final decision of the Commissioner." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007). A district court's review of an ALJ decision under 42 U.S.C. § 405(g) is very limited. The court may not engage in its own analysis as to whether a plaintiff "is severely impaired as defined by the SSA regulations." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor is the court permitted to reweigh

evidence, resolve conflicts in the record, decide questions of credibility, or substitute its own judgment. *Id.* Instead, the court is to ensure that the ALJ applied the proper legal criteria and that the ALJ's factual findings are supported by substantial evidence. *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). "Substantial evidence" requires "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"—in other words, "more than a scintilla" but "less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

This standard does not, however, require the ALJ to address all of the evidence presented; instead, the ALJ is only required to "provide a 'logical bridge' between the evidence and the conclusions." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (quoting *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)); *see Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."). Moreover, an ALJ's credibility determinations are entitled to "special deference," and are reversed only if "patently wrong." *Jones*, 623 F.3d at 1160.

**B.    Analysis**

Schumacher argues that a number of errors invalidate the ALJ's disability determination. First, she claims the ALJ ignored the limitations in her left hand and mistakenly found that she had fully recovered from the stroke. Second, she argues that the ALJ erred by not accepting the RFC proposed by her treating physician, Dr. Schubert. Third, she argues that the ALJ failed to properly evaluate her mental impairments

(fatigue, memory, focus) and loss of function as required by 20 C.F.R. § 404.1520a, and erred by failing to consider those limitations as part of RFC. Schumacher also argues that the ALJ impermissibly discounted Schumacher's testimony.

This court takes the question of Schumacher's credibility first. This court may only reverse the ALJ's credibility determination when that determination is "patently wrong." *See Jones*, 623 F.3d at 1160 ("Rather than nitpick the ALJ's opinion for inconsistencies or contradictions, we give it a commonsensical reading. Accordingly, we reverse credibility determinations only if they are patently wrong."). Here, the ALJ did not entirely disregard Schumacher's testimony; instead, he stated that while she did have some of the alleged symptoms of memory loss, she had them only to the degree of intensity and persistence consistent with an RFC of light work. (R. 23.) The ALJ engaged in a detailed discussion of the medical records, and noted that per Schumacher's own testimony, her daily life activities and abilities were inconsistent with her claims. (R. 25.) With regard to allegations of fatigue, Schumacher's counsel relied upon a particular medication called Zonegran to establish fatigue as a side-effect. However, Schumacher's progress notes with respect to that particular medication established that she self-reported not having any adverse effects. (*Id.*) The court cannot say that the ALJ's decision to discount Schumacher's testimony as to her symptoms was patently wrong in light of this evidence.

The court next turns to the ALJ's decision not to accord controlling weight to Dr. Schubert's opinion. "In assessing conflicting medical opinion evidence, ALJs must consider a variety of factors, including whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's

specialty; and the consistency and supportability of the physician's opinion. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). In *Books*, the Seventh Circuit noted that while an ALJ must "take into account the treating physician's ability to observe the claimant over a longer period," *id.* (quoting *Stephens v. Heckler*, 766 F.2d 284 (7th Cir. 1985) (quotation marks omitted)), a treating physician's opinion "is not the final word on a claimant's disability." *Id.* (*quoting Reynolds v. Bowen*, 844 F.2d 451 (7th Cir. 1988) (quotation marks omitted)). Here, the ALJ noted that in his March 2008 RFC questionnaire, Dr. Schubert described Schumacher as being able to sit or stand for four hours in an eight-hour day and being able to lift less than ten pounds frequently. A few months later, Dr. Schubert described Schumacher's asthma as being "ok," her anemia as stable, her gastro-esophageal reflux disease as being stable, her depression as being stable, and her stroke status as being stable. At that time, Dr. Schubert also reported Schumacher to have a normal neurological examination and a normal musculoskeletal examination. (R. 24.) In light of Dr. Schubert's own records, the ALJ had an adequate basis to discount Dr. Schubert's ultimate opinion that Schumacher was incapable of even light work. This conclusion was bolstered by the fact that the other evaluators, including the medical expert, came to a contrary conclusion. Moreover, the ALJ did not state that he gave Dr. Schubert's opinion no weight; instead, he merely said that he did not assign it "much weight." *See Young*, 362 F.3d at 1001 ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do. . . . And we may not re-weigh the evidence."). The court finds no error here.

Schumacher also argues that the ALJ failed to properly evaluate her mental impairments (fatigue, memory, focus) and loss of function as required by 20 C.F.R.

§ 404.1520a, and failed to consider those limitations as part of her RFC. As to the first point, there is nothing to support this contention. The ALJ appears to have followed the "special technique" described in § 404.1520a (*see* R. 20-22)—for instance, he expressly evaluated Schumacher's degree of functional limitation in activities of daily living, social functioning, concentration and episodes of decompensation, *see* § 404.1520a(c)—but perhaps more importantly, Schumacher does not pinpoint with any specificity the alleged error. The court rejects this claim. As to the second point, the ALJ agreed that Schumacher had certain mental limitations (although he did not agree with her evaluation of their severity) and the ALJ took those limitations into account in her RFC. For example, the ALJ found that Schumacher had moderate restrictions on her concentration, persistence, or pace—a more severe restriction than that provided by the government's psychological consultant—and that Schumacher did have some memory loss and fatigue. (R. 23, 25, 27.) This is why the ALJ reached his conclusion that Schumacher could no longer sustain her prior skilled work: "Because the claimant has somewhat impaired judgment, I limit her to unskilled work that does not require much decision-making." (R. 27.) The ALJ's RFC determination is supported by substantial evidence. *Skinner*, 478 F.3d at 841.

Finally, many of the points upon which Schumcher relies are not supported by the record. For instance, Schumacher claims the ALJ ignored the limitations in her left hand and mistakenly found that she had fully recovered from the stroke. But the ALJ expressly acknowledged that Schumacher had decreased sensitivity in some of her left fingers, and that she had some weakness in her left hand. (R. 22-23.) With regard to the stroke symptoms, the ALJ's statements are consistent with the record. The ALJ

specifically pointed to records supporting the idea that Schumacher had a "near total recovery." (R. 23.) Notably, Dr. Bone had found that there were no "residual effects" from the stroke at the time of his examination. (R 320.) The ALJ also discussed the various EEGs, and noted that while they showed some abnormality, there were no spike discharges; likewise, Schumacher's CT scan of her brain showed no acute abnormality. (R. 23.) Nothing that the ALJ said on this point is contradicted by the record. Schumacher next states that Dr. Lee, the medical expert, "agreed" that she takes medications to counteract fatigue. (Mot. for Summ. J. at 12.) Dr. Lee did no such thing. Instead, he recognized that fatigue was a possible side-effect of the medication, but went on to specifically note that there was no evidence of fatigue in Schumacher's progress notes and that as a result he did not consider it as part of the RFC. (R. 63.) Lastly, Schumacher claims the ALJ "ignored that Debra worked after the stroke until the seizure," (Mot. for Summ. J. at 14.), but the ALJ expressly discussed the fact of Schumacher's prior work history.

In sum, Schumacher has not identified any factual finding unsupported by substantial evidence, nor has she identified any legal error in the ALJ's opinion. The ALJ considered Schumacher's mental limitations in adopting an RFC, and the ALJ reasonably discounted both Schumacher's testimony and the RFCs provided Dr. Schubert in concluding that Schumacher could perform light, unskilled work. Because Schumacher could perform such work and that type of employment existed within the national economy, the ALJ properly concluded that she was not disabled as defined by the Social Security Act.

### III. CONCLUSION

For the reasons set forth above, the court denies Schumacher's motion for summary judgment.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: April 19, 2012